## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

      Plaintiff,

vs.                                        No. CR 10-0452 JB

CARLOS GONZALEZ,

      Defendant.

### MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on Defendant Carlos Gonzalez's Response to Presentence Report; Sentencing Memorandum, filed July 27, 2010 (Doc. 30) ("Sentencing Memorandum"). The Court held a hearing on July 29, 2010. The primary issue is whether Defendant Carlos Gonzalez has complied with the requirements of 18 U.S.C. § 3553(f) and U.S.S.G. § 5C1.2, and is thus eligible for a 2-level reduction to his base offense level. Because the Court finds that Defendant Carlos Gonzalez has failed to prove by a preponderance of the evidence that he made a complete and truthful disclosure to the United States of all the information he has concerning his offense, the Court finds that he has not satisfied all of the requirements of 18 U.S.C. § 3553(f) and thus does not qualify for the benefits of safety-valve treatment.

### FACTUAL BACKGROUND

On February 6, 2010, a New Mexico Motor Transportation Inspector at the Port of Entry in Gallup, New Mexico observed a tractor truck registered to AMA Trucking and bearing Nevada license plates hauling a flatbed trailer bearing California license plates enter the Port of Entry. See Presentence Investigation Report ("PSR") ¶ 7, at 4 (disclosed June 16, 2010). The inspector

requested the driver, Gonzalez, to produce a bill of lading[1] for the material being transported on the flatbed trailer.  See PSR ¶ 8, at 4.  Gonzalez informed the inspector that he was traveling from Las Vegas, Nevada to Milwaukee, Wisconsin, and handed over a bill of lading, which identified Gonzalez' trailer load as two pallets of cinder blocks and one pallet of lumber.  See PSR ¶ 8, at 4.  The inspector noted that there were no visible labels or shipping papers on the pallets.  See PSR ¶ 8, at 4.  The inspector requested to see Gonzalez' log book and directed him to drive into the parking lot for a safety inspection.  See PSR ¶ 9, at 4.  The inspector noted two violations in the log book.  See PSR ¶ 9, at 4.  During the walk-around inspection, the inspector also noted another violation for improper fuel-line protection.  See PSR ¶ 9, at 4.  The inspector asked to see the driver-safety equipment within the sleeper compartment.  See PSR ¶ 9, at 4.  While inside the sleeper compartment, the inspector observed two brown cardboard boxes on each side of the sleeper compartment that were taped with clear tape and each with a Staples logo on the box.  See PSR ¶ 9, at 4.  The inspector asked Gonzalez about the two cardboard boxes, to which Gonzalez stated that he was moving from Florida to Nevada, and that the boxes contained his personal possessions.  See PSR ¶ 9, at 4.  The inspector asked if he could open one of the boxes and Gonzalez gave verbal consent to the inspector.  See PSR ¶ 10, at 5.  The inspector opened one of the boxes, and immediately observed black, carbon paper covering box's contents.  See PSR ¶ 10, at 5.  The inspector believed the boxes contained illegal contraband and contacted an officer with the New Mexico Motor Transportation Division for assistance.  See PSR ¶ 10, at 5.

An officer arrived, and Gonzalez gave him verbal consent to look inside the cardboard boxes. The officer observed carbon paper wrapped around a kilogram-sized bundle, which was further

---

[1] A bill of lading is a document a carrier issues to a shipper acknowledging that specified goods have been received on board the tractor trailer.  See PSR ¶ 8, at 4.

contained in a vacuum-sealed bag. <u>See</u> PSR ¶ 11, at 5. The bag was cut open, and the officer observed a white substance similar to cocaine. <u>See</u> PSR ¶ 11, at 5. The officer placed Gonzalez in custody and advised him of his <u>Miranda</u>[2] warnings. <u>See</u> PSR ¶ 11, at 5. The officer removed the two cardboard boxes from the tracker truck. <u>See</u> PSR ¶ 12, at 5. Inside the boxes, the officer removed thirty-one kilogram-sized packages from one box and thirty-two kilogram-sized packages from the second box. <u>See</u> PSR ¶ 12, at 5. The officer conducted a field test on the substance in the packages, which tested positive for cocaine. <u>See</u> PSR ¶ 12, at 5.

Two interviews Gonzalez had with Drug Enforcement Agency ("DEA") agents are relevant to the Court's factual inquiry into whether Gonzalez has met his burden. The facts regarding the information Gonzalez gave in the first interview -- conducted on February 6, 2010, before Gonzalez was indicted -- are adopted from the PSR. The facts Gonzalez gave during the debrief with the DEA and the United States Attorney's Office -- conducted on July 21, 2010, after Gonzalez was indicted and entered into a plea agreement with the United States -- are adopted from the Report of Investigation: Safety Valve Debriefing of Carlos Gonzalez (signed July 26, 2010), filed July 27, 2010 (Doc. 31-1)("United States' Debrief Report"), which DEA agent Mark D. Hyland prepared. In his sentencing memorandum, Gonzalez states that the PSR "accurately sets forth the facts of the case under the header <u>Offense Conduct</u> starting on page 4 of the report. Paragraph's [sic] 13-20 detail Defendant's forthcoming statement regarding the facts of the case and his role in the offense." Sentencing Memorandum at 2.

1. **<u>Gonzalez' Initial Interview with the DEA</u>.**

At the February 6, 2010 interview with DEA agents, Gonzalez reported that he began

---

[2] <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966).

working for AMA trucking in January 2010.  See PSR ¶ 13, at 5.  He stated that the trip during which he was arrested was his first trip for AMA Trucking.  See id.  Gonzalez reported that in 2009 he was employed as a truck driver for Reynaldo Trucking.  See id.  He reported that, during the month of November 2009, while working for Reynaldo Trucking, he met a Hispanic male named Pablo.  See id.  He did not know Pablo's last name.  See id.  Gonzalez stated that he met Pablo inside a Travel Centers of America ("TA") gas station in Ontario, California.  See id.  He reported that Pablo and he engaged in idle conversation, and he recalled that he had seen Pablo at the same gas station in the past.  See id.  Gonzalez stated he was unsure whether Pablo was also a truck driver. See id.

Gonzalez stated that, within the month of December 2009, when he was working for Omar Delivery Trucking, he met with Pablo while refueling at a Flying J gas station located on Interstate 40 at the Arizona/California border.  See PSR ¶ 14, at 5.  He stated that Pablo and he engaged in idle conversation, and they exchanged telephone numbers.  See id.  Gonzalez stated that he attempted to call Pablo at the number that Pablo provided; however, the number was inoperable.  See id. Gonzales reported that, during the first week of January 2010, he received a private/restricted call from Pablo, during which Pablo asked Gonzalez when he would be traveling to California. See PSR ¶ 15, at 6.  Gonzalez reported that he told Pablo he was not currently working, but had applied with AMA Trucking in Las Vegas, Nevada; Pablo and Gonzalez agreed to stay in contact with each other.  See id.  Gonzalez reported that he never asked Pablo for his correct telephone number.  See id.

Gonzalez stated that, in January 2010, he called the owner of AMA Trucking, Arailde Matos -- the godfather of Gonzalez' youngest daughter -- and asked for employment opportunity. See PSR ¶ 16, at 6.  Gonzalez reported that Matos told him he had recently had a stroke and was

unable to drive his trucks.  See id.  Gonzalez stated that Matos provided him with employment as

a truck driver.  See id.  He reported that, on February 5, 2010, he flew from Florida to Nevada, and

his cousin, Pedro Colinas-Gonzalez, picked him up and took him to the Matos residence to get the

tractor and trailer Gonzalez would be driving.  See PSR ¶ 17, at 6.  Gonzalez stated that Matos

advised him to go to the AMA Trucking office and that a truck load along with his destination would

be waiting for him.  See id.  Gonzalez reported that Matos told him that he would give Gonzalez

directions to the AMA Trucking office over the telephone.[3]  See id.

Gonzales reported that he was on his way to the AMA Trucking office when he received a

private/restricted telephone call from Pablo.  See PSR ¶ 18, at 6.  Gonzalez stated that Pablo asked

him if he was in Las Vegas, which Gonzalez confirmed, and they agreed to meet in the parking lot

of a local Home Depot.  See PSR ¶ 18, at 6.  Gonzalez reported that he drove behind the Home

Depot and noticed Pablo waiting for him.  See id.  He reported that he did not see another vehicle

in the area or another person with Pablo.  See id.  Gonzalez reported that Pablo asked him if he was

willing to transport boxes to family members in Milwaukee, Wisconsin.  See id.  Gonzalez reported

that he agreed to take the boxes, and told Pablo that he was on his way to pick up a load and travel

to the east coast.  See id.  Gonzalez reported that Pablo told him that he would pay him for the trip,

---

[3] The PSR also indicates that on February 11, 2010, DEA agents contacted Matos regarding his tractor trailer which Gonzalez drove.  See PSR ¶ 21, at 7.  He indicated that Gonzalez was one of his drivers for AMA Trucking.  See id.  Matos reported that Gonzalez never came to his home. See id.  He reported that an individual named Hector Brae met Gonzalez on February 5, 2010 at a local truck stop in Las Vegas and gave the tractor trailer keys to Gonzalez.  See id.  When the DEA agent questioned Matos regarding Gonzalez' destination and load, Matos reported that he did not know where Gonzalez was traveling nor what he was transporting.  See PSR ¶ 21, at 7.  He stated that he lent Gonzalez his tractor and trailer to negotiate and manage his loads, and he would share half of the profits.  See id.  He also reported that he has not received any money from Gonzalez since Gonzalez has had the tractor and trailer.  See id.  He further explained that he had known Gonzalez for approximately eight years, confirmed that he is the godfather of Gonzalez' youngest daughter, but also stated that he only has a relationship with this goddaughter, not with Gonzalez.  See id.

but that they did not discuss a specific amount.  See id.  Gonzalez stated that Pablo told him that he had left a mobile telephone, gas money, and a bill of lading in the front seat of Gonzalez' tractor trailer.  See id.  Gonzalez reported that Pablo told him to head towards the address on the bill of lading and he would be receiving a telephone call from Pablo.  See id.  Gonzalez stated that Pablo instructed him not to use the mobile telephone he was provided to call Pablo and that Pablo told him "don't call me, I'll call you."  PSR ¶ 18, at 6.  Gonzalez stated that he was in a position where he could not see if anyone had entered his tractor trailer.  See PSR ¶ 18, at 6.  Gonzales reported that Pablo then left the area in an unknown direction and in an unknown vehicle.  See id.

Gonzalez then reported that he entered his tractor trailer, and observed a mobile telephone, a stack of money, and a bill of lading in the front seat.  See PSR ¶ 19, at 6.  He also reported that he observed two boxes between the seats.  See id.  Gonzalez stated that he placed the boxes on either side of the cabin storage area and did not attempt to conceal them.  See id.  Gonzalez reported that he filled out his drivers-log book indicating his destination as Milwaukee, Wisconsin, and began his trip.  See id.  The DEA Agent asked Gonzalez why he never went to the AMA Trucking office to pick up his legitimate load, to which Gonzalez did not have an answer.  See PSR ¶ 20, at 7.  He stated that he was nervous and did not know what to do, and that he felt remorse for betraying Matos, who was willing to find him employment.  See id.  The DEA Agent asked Gonzalez if he knew what he was transporting, and Gonzalez responded that he did not know what was in the boxes, but that he knew it was something illegal based on the circumstances.  See id.  Gonzalez reported that he did not have any other information regarding the trip or any other information regarding Pablo.  See id.

**2.       Gonzalez' Safety-Valve Debrief with the United States.**

Gonzalez debriefed with the United States on July 21, 2010.  DEA Agent Rey Rodriguez,

Hyland, Gonzalez' counsel, Kevin Riva and Angela Arellanes, and Assistant United States Attorney Nicholas Ganjei attended the debrief with Gonzalez.  See United States' Debrief Report at 1. Gonzalez reported that he is a resident of Florida and, at the time of his arrest, stated that he was traveling from Las Vegas to Milwaukee.  See United States' Debrief Report ¶ 3, at 1.  Gonzalez stated that he was an unemployed truck driver and knew his youngest daughter's godfather, Matos, was the owner of AMA Trucking in Las Vegas.  See id. ¶ 4, at 1-2.  He stated that Matos had a recent heart attack and could no longer drive.  See id. ¶ 4, at 2.  Gonzalez reported that he contacted Matos, who hired Gonzalez to drive for AMA Trucking.  See id. ¶ 5, at 2.

Gonzalez stated that, in early February 2010, Gonzalez flew from Florida to Las Vegas. See id. ¶ 5, at 2.  He reported that, after arriving, he met his cousin Colinas-Gonzalez, and they drove to a truck yard where the tractor trailer in which Gonzalez would be arrested was parked. See id. ¶ 6, at 2.  According to Gonzalez, the trailer had already been loaded with wood and cement blocks.  See id.  Gonzalez reported that he was told that the current freight on the trailer was to be delivered in the Las Vegas area.  See id.  Gonzalez also reported that a third-party male whose name he did not know provided him keys to the tractor trailer.  See id. ¶ 7, at 2.  He stated that he never met with Matos before starting the road trip.  See id.  Gonzalez reported that it was his first trip with AMA Trucking, and that Matos and Gonzalez had worked out that they would split the profits from Gonzalez' driving loads for AMA Trucking.  See id. ¶ 8, at 2.

Gonzalez reported that he had previously met a Mexican male whom he knows only as Pedro.  See United States' Debrief Report ¶ 9, at 2.  He stated that he met Pedro at various TA truck stops.  See id.  He also reported that, every time Pedro called Gonzalez, the telephone number was blocked/private.  See id.  He reported that he never knew Pedro's mobile telephone number.  See id.  He stated that he did not know of which Mexican city and/or Mexican state Pedro is a native.

-7-

See id.

Gonzalez reported that, shortly after receiving Matos' tractor trailer, Pedro contacted him and they agreed to meet at a Home Depot parking lot in Las Vegas.  See United States' Debrief Report ¶ 11, at 2-3.  Gonzalez remembered that the Home Depot was near the airport and a tunnel. See id.  He parked the tractor trailer at the rear of the Home Depot parking lot and met Pedro by the side of the Home Depot building.  See id. ¶ 13, at 3.  Gonzalez reported that Pedro was "very smart and well dressed." Id. ¶ 13, at 3.  He stated that he never knew about Pedro's vehicle or residence, and did not know whether Pedro was a commercial truck driver.  See id. ¶ 14, at 3.  He reported that Pedro had either a wife or girlfriend, but he had never met her and he did not know if Pedro had children.  See id.  He stated, however, that he and Pedro had a general conversation about family and small talk.  See id. ¶ 15, at 3.

Gonzalez reported that he knew he had to go to the AMA Trucking office to obtain a bill of lading for the wood and cement load, but instead he met with Pedro.  See United States' Debrief Report ¶ 12, at 3.  According to Gonzalez, Pedro told him that he had blank bills of lading that Gonzalez could use for the trip.  See id. ¶ 16, at 3.  Gonzalez reported that Pedro asked him if he could transport two boxes to Milwaukee for Pedro.  See id. ¶ 17, at 2.  He stated that he agreed and that he knew the current freight load on the tractor trailer would provide a cover for the illegal substances that he knew were inside the boxes.  See id. ¶¶ 17-18, at 3.

Gonzalez reported that Pedro told him that the two boxes, a mobile telephone, a bill of lading, and some money would be inside Gonzalez' tractor trailer when he returned to it.  See United States' Debrief Report ¶ 19, at 3.  Gonzalez stated that Pedro told him he would be compensated for transporting the boxes to Milwaukee, but that they never spoke about a specific amount of money for the transaction.  See id. ¶ 23, at 4.  Gonzalez reported that, when he returned to the tractor trailer

-8-

after about forty-five minutes, the two boxes, mobile telephone, about $2,000.00 in cash, and a handwritten bill of lading were inside the tractor.  See id. ¶ 26, at 4.

Gonzalez stated that Pedro told him not to call him on the mobile telephone, because no one would answer.  See id. ¶ 20, at 4.  He further reported that Pedro told him that he would call Gonzalez after he had been driving for awhile.  See id.  Gonzalez stated that perhaps Pedro's mobile telephone had a tracking device attached to it or Gonzalez' vehicle was being tailed, with someone watching the load and Gonzalez.  See id. ¶ 22, at 4.

At the debrief, Hyland asked Gonzalez why he was driving eastbound on Interstate 40 if he was traveling from Las Vegas to Milwaukee.  See United States' Debrief Report ¶ 21, at 4.  Gonzalez stated that Pedro recommended taking Interstate 40 to Tucumcari, New Mexico, and then to take United States Highway 54 to Wichita, Kansas, because there would be fewer checkpoints using that route.  See id. ¶ 22, at 4.  Rodriguez asked Gonzalez how many times he had met Pedro, and Gonzalez responded that they had met four times and had between ten and fifteen telephone conversations.  See id. ¶ 24, at 4.  Mr. Ganjei asked Gonzalez why he did not check in at AMA Trucking, and why he was not concerned about delivering the wood and cement load to the Las Vegas destination he said they were to go.  See id. ¶ 25, at 4.  Gonzalez could not explain why that was of no concern to him, and could not explain why AMA Trucking would not be concerned about an unaccounted for tractor trailer which supposedly was out on a local delivery.  See id.

Hyland told Gonzalez that a review of Gonzalez' cellular telephone records indicate no listings for any Pedro.  See United States' Debrief Report ¶ 29, at 5.  Hyland also stated that Gonzalez was transporting seventy-one kilograms of cocaine worth approximately $1.4 million dollars.  See id. ¶ 30, at 5.  He stated that no drug trafficking organization would trust Gonzalez with that much cocaine based on the story that Gonzalez told at his debrief.  See id.  Gonzalez stated that

was his story.  See id. ¶ 31, at 5.

## PROCEDURAL BACKGROUND

On February 23, 2010, the Grand Jury issued an Indictment charging Gonzalez with one count of possession with intent to distribute five kilograms and more of a mixture and substance containing a detectable amount of cocaine, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(A). See Indictment, filed February 23, 2010 (Doc. 13).  Gonzalez and the United States entered into a plea agreement on April 19, 2010.  See Plea Agreement, filed April 19, 2010 (Doc. 27).  The plea agreement indicates that Gonzalez may be eligible for the safety-valve provisions set forth in 18 U.S.C. § 3553(f) and U.S.S.G. § 5C1.2.  See Plea Agreement ¶ 5, at 2.  The plea agreement states: "This reduction depends on, among other requirements of § 3553(f), the Defendant truthfully providing to the Government, before sentencing, all information and evidence concerning the offenses that were part of the same course of conduct underlying this agreement."  Plea Agreement ¶ 5, at 3.  Gonzalez debriefed with the United States on July 21, 2010.

In his sentencing memorandum, Gonzalez argues that he qualifies for the safety valve provisions.  See Sentencing Memorandum at 2.  He contends that the PSR accurately sets forth the plea agreement and the facts of the case.  See id.  Gonzalez urges the Court to make the finding that he has satisfied the criteria for the safety valve and apply the 2-point reduction to his offense level. See Sentencing Memorandum at 2.

The United States, however, argues that Gonzalez' debrief was unsatisfactory -- not because it lacked relevant or useful information, but because it was "a purposefully misleading account of people that may not exist, and events that may not have transpired."  United States' Response to Defendant's Sentencing Memorandum at 2, filed July 27, 2010 (Doc. 31).  The United States gives a number of reasons why it believes Gonzalez' debrief is deficient.  First, Gonzalez stated that it was

his first time transporting narcotics and his first time driving for AMA Trucking, but given the amount, value, and the way in which the cocaine was packaged, the United States contends it is "simply unbelievable that this was the first time Defendant transported narcotics." United States' Response at 2. Second, Gonzalez stated he was transporting the load of cement and wood to a local Las Vegas destination, but did not have a legitimate bill of lading. The United States contends that there never was a legitimate delivery to be made and the items were props for the drug trafficking shipment. See id. Third, the United States argues that, if the cement and wood were for a legitimate delivery in Las Vegas, it makes no sense that Gonzalez would leave Las Vegas with the items still on the truck, without concern that someone would notice the delay of the delivery. See id. at 3.

Fourth, Gonzalez was unable to explain why AMA Trucking, who was expecting him to make a short, cross-town delivery, would not be concerned that Gonzalez, without warning, took a company vehicle and drove cross-country with it, especially given it was his first time driving for AMA Trucking. See id. Fifth, Gonzalez could not provide "even the most rudimentary description" of Pedro and was unable to give his last name, even though Pedro trusted Gonzalez with a large quantity of cocaine. See id. Further, the United States argues that, because Pedro allegedly gave Gonzalez one-hundred-fifty pounds of cocaine in a public place, he would have needed a vehicle, and yet Gonzalez stated he never saw a vehicle. He also stated he did not know at which Home Depot his meeting with Pedro took place, and the only information he could provide is that Pedro lives in California. See id. The United States submits that Pedro does not exist and that Gonzalez had a much more direct role in procuring the cocaine. See id. Sixth, the United States argues that, when Gonzalez was asked whether he could provide any detail at all that would confirm that Pedro exists, he replied no, and he gave, what the United States contends, was a purposefully vague answer that he met Pedro at TA truck stops in California. See id. at 3-4. The United States argues that he

could not say specifically which truck stop.  It is the United States' position that such meetings never occurred, and that Gonzalez' statement is untruthful.  Finally, the United States argues that, despite that Gonzalez stated he was transporting the cocaine to Wisconsin, he traveled south from Las Vegas to Arizona, and then along Interstate 40.  The United States believes that Wisconsin was never Gonzalez' actual destination.  See id. at 4.

At the hearing, Mr. Riva argued that, because Gonzalez had recently flown from Miami to Las Vegas, there was no time for him to have completed other drug transactions before the drug transaction in this case.  See Transcript of Hearing at 4:7-21 (taken July 29, 2010)("Tr.")(Riva).[4] He further argued that the Court should not credit the United States' characterization of the cement and wood on the tractor trailer as props, because Gonzalez, in his first interview with the DEA after his arrest, stated that the wood and cement were already on the truck when "Pablo" contacted him. See Tr. at 4:22-5:5 (Riva).[5]  Moreover, if Gonzalez had obtained the legitimate bill of lading from AMA Trucking, it would have had a local Las Vegas address and would have raised red-flags when Gonzalez took the tractor trailer out of state.  See id. at 5:6-16 (Riva).  He argues that the bill of lading Gonzalez had when he was arrested was handwritten, which lends credibility to his story that Pablo had a blank bill of lading and filled it out for Gonzalez.  See id. at 5:16-6:2 (Riva).  Mr. Riva further argued that, because Gonzalez had a personal relationship with Matos, AMA Trucking's owner, it is credible that he was not concerned about AMA Trucking's reaction to one of its vehicles going missing for a longer period of time.  See Tr. at 6:3-19 (Riva).  Moreover, Gonzalez was

---

[4] The Court's citations to the transcript refer to the court reporter's original, unedited version. Any final transcript may contain slightly different page and/or line numbers.

[5] At the hearing, Mr. Riva stated that the man with whom Gonzalez met and from whom he received a blank bill of lading was "Pablo."  Tr. at 5:2-3 (Riva).  Gonzalez identified the man as "Pedro" during his debrief with the United States.  See United States' Debrief Report ¶ 9, at 2.

stopped within twenty-four hours and thus had not been gone long enough to raise suspicion, and planned to call Matos with a story as to where he was and why. See id. at 6:19-7:2 (Riva). Mr. Riva argued that Gonzalez could not identify to which Home Depot he went because he was new to the Las Vegas area. See id. at 7:8-12 (Riva). He argued that Gonzalez gave all the information he had from his limited amount of time in the area and his limited amount of time in the Home Depot parking lot. See id. at 7:13-18 (Riva). He further argued it is not unusual to see the same person repeatedly at a truck stop, thus lending credibility that Gonzalez saw Pablo at truck stops. See id. at 7:18-22 (Riva). Finally, Mr. Riva argued that Gonzalez has no reason to lie. See id. at 9:16 (Riva).

In response, Assistant United States Attorney John Anderson argued that the easiest way to see that Gonzalez' story is untruthful is to look at the big picture -- an individual who was entrusted by somebody with approximately $1.5 million dollars worth of cocaine. See Tr. at 10:17-21 (Anderson). Mr. Anderson argued that is not something that a reasonable individual entrusts to someone he or she does not know, and it is not something that a driver receives from someone that he or she does not know. See id. at 10:22-25 (Anderson). The facts, he argued, clearly demonstrate a high level of trust and a high degree of coordination. See id. at 10:25-11:2 (Anderson). Mr. Anderson contended that Gonzalez' story does not acknowledge that reality, and that the details he is unable to give do not fit a situation with the quantity of narcotics involved. See id. at 11:3-10 (Anderson). Mr. Riva argued that Gonzalez acted out of desperation, and perhaps whoever provided the drugs also acted out of desperation and took a chance he would not normally take. See id. at 12:1-14 (Riva). Mr. Riva contended that such behavior, however, does not indicate that Gonzalez is being untruthful. See id.

## AW REGARDING SAFETY VALVE

Section § 3553(f) of Title 18 of the United States Code, commonly known as the safety valve, allows courts to impose a sentence below a statutory minimum in certain circumstances. Section 3553(f) states that, in the case of an offence under 21 U.S.C. §§ 841, 844, 846, 960, or 963, the court shall impose a sentence in accordance with the applicable guidelines without regard to any statutory minimum sentence, if the court finds at sentencing, after the United States has been afforded the opportunity to make a recommendation, that:

> (1) The defendant does not have more than 1 criminal history point, as determined under the sentencing guidelines;

> (2) The defendant did not use violence or credible threats of violence or possess a firearm or other dangerous weapon (or induce another participant to do so) in connection with the offense;

> (3) The offense did not result in death or serious bodily injury to any person;

> (4) The defendant was not an organizer, leader, manager, or supervisor of others in the offense, as determined under the sentencing guidelines and was not engaged in a continuing criminal enterprise, as defined in 21 U.S.C. § 848; and

> (5) Not later than the time of the sentencing hearing, the defendant has truthfully provided to the Government all information and evidence the defendant has concerning the offense or offenses that were part of the same course of conduct or of a common scheme or plan, but the fact that the defendant has no relevant or other useful information to provide or that the Government is already aware of the information shall not preclude a determination by the court that the defendant has complied with this requirement.

18 U.S.C. § 3553(f). United States v. Cousins, 455 F.3d 1116, 1124 (10th Cir. 2006)("If the district court makes these five findings, the defendant is eligible instead for the range proscribed by the United States Sentencing Guidelines."), cert. denied, 127 S. Ct. 706 (2006); U.S.S.G. § 5C1.2(a)(similarly providing that "the court shall impose a sentence in accordance with the applicable guidelines without regard to any statutory minimum sentence, if the court finds that

the defendant meets the criteria in 18 U.S.C. § 3553(f)(1)-(5)").

The burden is on the defendant to prove that he or she meets all the criteria for the safety-valve provision.  See United States v. Virgen-Chavarin, 350 F.3d 1122, 1129 (10th Cir. 2003).  A defendant can meet this burden by showing, "by a preponderance of the evidence, that he qualifies for relief from a minimum mandatory sentence."  United States v. Patron Montano, 223 F.3d 1184, 1189 (10th Cir. 2000); United States v. Gonzalez-Montoya, 161 F.3d 643, 652 (10th Cir. 1998)("The burden of proving all five requirements by a preponderance of the evidence lies with the defendant.").  To satisfy this criteria, the defendant must affirmatively volunteer all he or she knows, including facts beyond the basic elements of the crime.  See United States v. Myers, 106 F.3d at 941.  "The government does not bear the burden of seeking out, or specifically requesting, information from the defendant."  United States v. Perez-Marin, 124 Fed. Appx. 612, 613 (10th Cir. 2005)(citing United States v. Ramirez, 94 F.3d 1095, 1101 (7th Cir. 1996)).

The fifth requirement for safety-valve eligibility -- § 3553(f)(5) -- which has been described as the "tell all that you can tell" requirement, is very broad, requiring disclosure of everything that the defendant knows about his or her actions, and about the actions of those who participated in the crime with the defendant.  United States v. Acosta-Olivas, 71 F.3d 375, 378-79 (10th Cir. 1995). See United States v. Jeffers, 329 F.3d 94, 99 (2d Cir. 2003)(noting that a defendant's perjury does not disqualify him from the safety-valve reduction if he "comes clean" before sentencing). Disclosure is required "whether or not it is relevant or useful to the government's investigation." United States v. Myers, 106 F.3d 936, 940 (10th Cir. 1997)(quoting United States v. Shrestha, 86 F.3d 935 (9th Cir. 1996)).  A defendant's disclosure "must not merely be truthful but also complete."  United States v. Stephenson, 452 F.3d 1173, 1180 (10th Cir. 2006).  The specific

question § 3553(f)(5) poses -- whether the defendant has provided the United States with truthful and complete information -- is a factual determination.  See United States v. Altamirano-Quintero, 511 F.3d 1087, 1098 (10th Cir. 2007); United States v. Stephenson, 452 F.3d at 1180 (stating that the Tenth Circuit is "cognizant that the district court's application of the safety valve is fact specific and dependent on credibility determinations that cannot be replicated with the same accuracy on appeal").

 In United States v. Altamirano-Quintero, the United States Court of Appeals for the Tenth Circuit reviewed the district court's finding that the defendant Luis Altamirano-Quintero did not qualify for § 3553(f)'s safety valve because he had not truthfully disclosed all the information he had concerning his offense.  See 511 F.3d at 1098.  The Tenth Circuit held that "the record before the district court was sufficient to support the district court's finding that Altamirano-Quintero had failed to prove by a preponderance of the evidence that he had made a complete and truthful disclosure to the Government of all the information he had concerning his offense." Id. at 1099.  The Tenth Circuit found that there were "obvious informational gaps in the facts Altamirano-Quintero admitted when he pled guilty." Id. at 1098.  Specifically, Altamirano-Quintero admitted that he had methamphetamine in his car, but he did not indicate how or where he got the methamphetamine, or what he intended to do with it.  See id.  Altamirano-Quintero also did not identify any other participants in the charged drug conspiracy or explain why he could not do so. See id.

 Similarly, in United States v. Stephenson, the Tenth Circuit reviewed the district court's denial of the safety-valve adjustment, because it found that the defendant had not truthfully disclosed to the United States all he knew about the offense of conviction or relevant conduct. See 452 F.3d at 1179.  In an attempt to satisfy § 3553(f)(5)'s requirements, the defendant provided

the United States with a "proffer letter" describing the events surrounding his drive to Arizona, which he made in a truck with a hidden compartment underneath the truck's bed containing sixty kilograms of cocaine.  452 F.3d at 1179.  The letter also stated that the defendant was willing to provide additional information if the United States deemed the proffer insufficient to satisfy the safety-valve's disclosure requirement.  See id.  At sentencing, the United States opposed the adjustment, arguing that the defendant's proffer letter did not satisfy the safety-valve requirements. See id.  The United States conceded the proffer letter did not contain any false statements, but argued the proffer did not meet the disclosure requirement.  "It doesn't mention anything essentially related to a broader conspiracy and the other acts or the other participation that [the defendant] may have made or may have been involved in this conspiracy."  452 F.3d at 1179.  The Tenth Circuit found that the district court did not commit clear error in denying the defendant the safety-valve adjustment, explaining:

> To say the least, we are very skeptical of [the defendant's] professed lack of knowledge regarding the conspiracy's other participants.  The Government's evidence indicates this larger criminal enterprise had previously entrusted [the defendant] with transporting 60 to 70 kilograms of cocaine and 500 pounds of marijuana once a month for approximately a year.  We think it highly unlikely [the defendant] did not know the identities of those individuals who were involved in assisting [him] and Stephenson.

452 F.3d at 1181.

In United States v. Perez-Marin, the Tenth Circuit affirmed the district court's finding that the defendant did not carry his burden of demonstrating that he had satisfied the requirements for a safety-valve reduction by a preponderance of the evidence.  The Tenth Circuit explained:

> Specifically, the [district] court found it "inconceivable" that Mr. Perez-Marin would be able to obtain the quantity of methamphetamine at issue in this case by flagging down in a park a man he had never met, soliciting two-and-one-half pounds of the narcotic, and in exchange promising his car as collateral.  Trial counsel's arguments, themselves somewhat inconsistent with the defendant's own statements, were simply

insufficient to counter this assessment.  The government is not required to disprove the defendant's version, and ultimately the district court must sort out the facts as was done here.

124 Fed. Appx. at 613.

In United States v. Aguirre-Garcia, No. CR 08-0823, 2009 U.S. Dist. LEXIS 124546 (D.N.M. Dec. 15, 2009)(Browning, J.), the United States contended that one of the two defendants, Roberto Synder, failed to satisfy the requirements of § 3553(f)(5), and the Court agreed.  Although the Court did not believe Snyder was telling a false story, it found that his proffer did not divulge all he knew about the offenses in which he was involved.  See 2009 U.S. Dist. LEXIS 124546, at *12.  The Court explained:

> There are, as the United States has contended, too many gaps and too much vagueness in Mr. Snyder's proffer.  The Court does not expect Mr. Snyder necessarily to be able to identify the old man or the various "persons unknown" that appear throughout the declaration, but Mr. Snyder likely could have provided more information about them.  For example, he could have at least given a physical description of the old man or some other information that might help to identify him.  And he could have provided more information about the unknown persons who had Mr. Snyder contact the old man in the first place.  Even if Mr. Snyder could not name these persons, he could have explained the circumstances in which he spoke with them, why they might have told him to contact the old man, and why Mr. Snyder was talking with them and decided to call the old man.  The declaration is riddled with other examples of persons unknown, without a sliver of identifying information about any of them.

2009 U.S. Dist. LEXIS 124546, at **12-13.

## ANALYSIS

Gonzalez argues that he qualifies for the benefits of the safety-valve provisions in 18 U.S.C. § 3553(f) and U.S.S.G. § 5C1.2.  The United States contends that Gonzalez failed to satisfy the safety-valve requirements when he was not truthful and complete in his debrief.  Whether Gonzalez has provided the United States with truthful and complete information is a factual determination for the Court.  See United States v. Altamirano-Quintero, 511 F.3d at 1098.  The

-18-

Court has carefully reviewed all of the facts in this case -- in the PSR, in the debriefing report, in the parties' briefings, and at the hearing -- and the Court believes that Gonzalez has failed to prove by a preponderance of the evidence that he has made a complete and truthful disclosure to the United States of all the information he has concerning his offense.

To satisfy the safety-valve requirements, Gonzalez must affirmatively volunteer all he knows, including facts beyond the basic elements of the crime. See United States v. Myers, 106 F.3d at 941; United States v. Perez-Marin, 124 Fed. Appx. at 613 ("The government does not bear the burden of seeking out, or specifically requesting, information from the defendant."). The Court does not necessarily agree with the United States that Gonzalez has provided false information. Looking at the facts that Gonzalez has provided and the facts which he states he does not have, the Court believes, however, that Gonzalez has not been complete in the information he has regarding his drug trafficking and the other people involved. See United States v. Stephenson, 452 F.3d at 1180 (stating that a defendant's disclosure "must not merely be truthful but also complete.").

As the Court has previously noted, "the Court is, to a significant degree, dependent upon the United States' assessment as to the value of the information that the defendant gives during debriefing." United States v. Guerrero-Marquez, No. CR 07-1050, 2007 U.S. Dist. LEXIS 97719, at *27 (D.N.M. Dec. 13, 2007)(Browning, J.). The Court agrees with the United States that the quantity of narcotics and the high value of those narcotics -- approximately $1.5 million dollars -- does not suggest the arms-length transaction that Gonzalez' debrief portrays. Rather, the circumstances suggest a higher degree of familiarity and trust between Gonzalez and whomever else was involved -- whether the individual was named Pablo, Pedro, or someone else. The Court agrees with the United States that it is unlikely that Gonzalez knows nothing but the name of the man who

gave him such a large quantity of drugs to transport across the United States.  The name did not even stay consistent between Gonzalez' initial interview and his debrief.  Gonzalez was unable or unwilling to give a description of Pablo/Pedro, indicate whether he had a car, give his telephone number, or give any identifying information other than "very smart and well dressed."  United States' Debrief Report ¶ 13, at 3.  Any number of individuals can be described as "very smart and well dressed," and the Court believes that Gonzalez may have intentionally given the United States a vague and unhelpful description of a man he supposedly met on multiple occasions and with whom he spent over forty-five minutes in the Home Depot parking lot.  It concerns the Court that Gonzalez cannot describe Pablo/Pedro with any more detail or offer an explanation for why he is unable to describe him.  See United States v. Altamirano-Quintero, 511 F.3d at 1098 (finding "obvious informational gaps in the facts," including that the defendant did not identify any other participants in the charged drug conspiracy or explain why he could not do so).

The Court believes Gonzalez' debrief shows obvious informational gaps.  First, there are inconsistencies between his initial interview with the DEA and his later debrief.  For example, Gonzalez initially stated that, when he arrived in Las Vegas, his cousin took him to Matos' residence, where he picked up the tractor trailer, and that Matos told him to go to the AMA Trucking office to pick up a load and destination.  See PSR ¶ 17, at 6.  At the debrief, Gonzalez reported that his cousin drove him to a truck yard where the tractor trailer was parked.  See United States' Debrief Report ¶ 6, at 2.  According to Gonzalez, the trailer had already been loaded with wood and cement blocks, and was to be delivered in the Las Vegas area.  See id.  He stated that he never met with Matos before starting the road trip.  See id.  While the version of Gonzalez' story at the debrief matches Matos' reporting that Gonzalez never came to his home, the Court is concerned that the details of Gonzalez' story have changed and do not make sense considering the totality of the

circumstances.  It is still unclear to the Court why the tractor trailer would have cargo, but no bill of lading or destination.  The Court also shares the United States' concern why Gonzalez was not troubled with the fact that he would be taking an AMA Trucking vehicle across the country, when he was supposedly tasked with a local cross-town delivery.  Although Gonzalez argues that his relationship with Matos would have enabled him to lie about his whereabouts, Matos denies that any such relationship exists.  Moreover, if AMA Trucking had pre-loaded the tractor trailer, but was waiting for Gonzalez to pick up the bill of lading at the office, they would have noticed even earlier that he never arrived.  The Court agrees with the United States that the facts suggest that AMA Trucking did not load the tractor trailer with the cement and wood, but rather that Pablo/Pedro or with whomever Gonzalez was working was responsible for loading the tractor trailer with false cargo in addition to the large quantity of drugs.  The mere presence of inconsistent or unexplained facts leads the Court to believe that Gonzalez is not being completely forthcoming with the United States.

Second, there are parts of Gonzalez' story where it seems improbable that he could not provide more details.  For example, it seems more probable than not that he would be able to describe at which TA truck stops he previously met Pablo/Pedro.  If Gonzalez spoke to Pablo/Pedro between ten and fifteen times on the telephone, there is likely also a reason that they spoke so often.  If they spoke as often as Gonzalez represents, then it seems more likely than not that some, if not all, of the meetings at the TA truck stops were planned.  There are just not enough details to convince the Court that Gonzalez has told all he can tell.  See United States v. Acosta-Olivas, 71 F.3d at 378-79.

Moreover, the Court believes the inconsistent and sometimes incredible information in this case is on point with the disclosures in other cases in which the Tenth Circuit has affirmed the

district court's decision to deny the safety-valve provisions.  See United States v. Stephenson, 452 F.3d at 1181 ("We think it highly unlikely [the defendant] did not know the identities of those individuals who were involved in assisting [him]."); United States v. Perez-Marin, 124 Fed. Appx. at 613 (affirming the district court's finding that it was inconceivable that the defendant would be able to obtain a large quantity of methamphetamine by flagging down in a park a man he had never met).  These cases further persuade the Court that application of the safety valve is inappropriate in this case.

In sum, there are too many gaps and illogical connections in Gonzalez' proffer for the Court to be persuaded, by a preponderance of the evidence, that he has given the United States all of the information he has.  The fifth requirement for safety-valve eligibility -- § 3553(f)(5) -- which has been described as the "tell all that you can tell" requirement, is very broad, requiring disclosure of everything that the defendant knows about his actions and about the actions of those who participated in the crime with him.  United States v. Acosta-Olivas, 71 F.3d at 378-79.  Ultimately, Gonzalez bears the burden of proving to the Court that his debrief is complete by a preponderance of the evidence.  See United States v. Patron Montano, 223 F.3d at 1189.  Here, Gonzalez has failed to carry that burden of showing that he "has truthfully provided to the Government all information and evidence [that he] has concerning" his transporting drugs.  18 U.S.C. § 3553(f)(5).  Thus, the Court finds that he is ineligible for safety-valve relief, and the Court will deny his request for the safety-valve application.

**IT IS ORDERED** that Defendant Carlos Gonzalez' request in his Response to Presentence Report; Sentencing Memorandum for application of the safety-valve provision set forth in 18 U.S.C. § 3553(f) and U.S.S.G. § 5C1.2 is denied.

_____
UNITED STATES DISTRICT JUDGE

*Counsel*:

Kenneth J. Gonzales
   United States Attorney
John C. Anderson
Nicholas Ganjei
   Assistant United States Attorneys
Albuquerque, New Mexico

  *Attorneys for the Plaintiff*

Kevin R. Riva
Los Angeles, California

-- and --

Angela Arellanes
Albuquerque, New Mexico

  *Attorneys for the Defendant*