# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

      Plaintiff,

vs.                                      No. CR 10-0452 JB

CARLOS GONZALEZ,

      Defendant.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on Defendant Carlos Gonzalez's Supplemental Sentencing Memorandum, filed August 26, 2010 (Doc. 38)("Supplemental Sentencing Memorandum"). The Court held a hearing on August 31, 2010. The primary issue is whether the Court should reconsider its Memorandum Opinion and Order, filed August 18, 2010 (Doc. 34)("August 18, 2010 Memorandum Opinion and Order"). The Court, in its Memorandum Opinion and Order, found that Gonzalez had not satisfied all of the requirements of 18 U.S.C. § 3553(f) and thus did not qualify for the benefits of safety-valve treatment, because he failed to prove by a preponderance of the evidence that he made a complete and truthful disclosure to the United States of all the information he had concerning his offense. See August 18, 2010 Memorandum Opinion and Order at 1. While the Court will carefully reconsider its prior Memorandum Opinion and Order, the Court will deny Gonzalez' request that the Court sustain his objection and grant the safety-valve reduction because the Court finds that the additional information that Gonzalez has provided the Court -- in the Supplemental Sentencing Memorandum, supporting declarations, and hearing -- does not convince the Court that Gonzalez has proved by a preponderance of the evidence that he made a complete and truthful disclosure to the United States.

## FACTUAL BACKGROUND

On February 6, 2010, Gonzalez was arrested after two boxes filled with cocaine were found in a tractor truck, registered to AMA Trucking, which Gonzalez was driving.  See Presentence Investigation Report ("PSR") ¶¶ 7-12, at 4-5 (disclosed June 16, 2010).  Gonzalez conducted two relevant interviews with Drug Enforcement Agency ("DEA") agents.  The facts regarding the information Gonzalez gave in the first interview -- conducted on February 6, 2010, before Gonzalez was indicted -- are adopted from the PSR.  The facts Gonzalez gave during the debrief with the DEA and the United States Attorney's Office -- conducted on July 21, 2010, after Gonzalez was indicted and entered into a plea agreement with the United States -- are adopted from the Report of Investigation: Safety Valve Debriefing of Carlos Gonzalez (signed July 26, 2010), filed July 27, 2010 (Doc. 31-1)("United States' Debrief Report"), which DEA agent Mark D. Hyland prepared.

### 1.      Gonzalez' Initial Interview with the DEA.

At the February 6, 2010, interview with DEA agents, Gonzalez stated that the trip during which he was arrested was his first trip for AMA Trucking.  See PSR ¶ 13, at 5. Before his employment for AMA Trucking began, Gonzalez worked as a truck driver for several other trucking companies.  See id. ¶¶ 13-14, at 5.  During this time, Gonzalez met a Hispanic male named Pablo. See id. ¶ 13, at 5.  He did not know Pablo's last name.  See id.  Gonzalez and Pablo first met  inside a Travel Centers of America ("TA") gas station in Ontario, California, where they engaged in idle conversation.  See id.

In January 2010, Gonzalez called the owner of AMA Trucking, Arailde Matos -- the godfather of Gonzalez' youngest daughter -- and asked about employment opportunities.  See id. ¶ 16, at 6. Gonzalez stated that Matos provided him with employment as a truck driver.  See id.

Gonzalez reported that, on February 5, 2010, he flew from Florida to Nevada, and his cousin, Pedro Colinas-Gonzalez, picked him up and took him to the Matos residence to get the tractor and trailer Gonzalez would be driving.  See id. ¶ 17, at 6.  Gonzalez stated that Matos advised him to go to the AMA Trucking office and that a truck load along with his destination would be waiting for him. See id.

Gonzalez reported that he was on his way to the AMA Trucking office when he received a private/restricted telephone call from Pablo.  See id. ¶ 18, at 6.  Gonzalez stated that Pablo asked him if he was in Las Vegas.  See id.  Gonzalez confirmed that he was, and they agreed to meet in the parking lot of a local Home Depot.  See id.  Gonzalez reported that Pablo asked him if he was willing to transport boxes to family members in Milwaukee, Wisconsin.  See id.  Gonzalez reported that he agreed to take the boxes, and told Pablo that he was on his way to pick up a load and travel to the east coast.  See id.  Gonzalez stated that Pablo told him that he had left a mobile telephone, gas money, and a bill of lading[1] in the front seat of Gonzalez' tractor trailer.  See id. ¶ 18, at 6. Gonzalez reported that Pablo told him to head towards the address on the bill of lading and that he would be receiving a telephone call from Pablo.  See id.  Gonzalez reported that Pablo then left the area in an unknown direction and in an unknown vehicle.  See id.

Gonzalez then reported that he entered his tractor trailer, and observed a mobile telephone, a stack of money, and a bill of lading in the front seat.  See id. ¶ 19, at 6.  He also reported that he observed two boxes between the seats.  See id.  Gonzalez reported that he filled out his driver's log book indicating his destination as Milwaukee, Wisconsin, and began his trip.  See id.  The DEA agent asked Gonzalez why he never went to the AMA Trucking office to pick up his legitimate load.

---

[1]A bill of lading is a document a carrier issues to a shipper acknowledging that specified goods have been received on board the tractor trailer. See PSR ¶ 8, at 4.

See id. ¶ 20, at 7. Gonzalez did not have an answer. See id.

2.      **Gonzalez' Safety-Valve Debrief with the United States**.

Gonzalez debriefed with the United States on July 21, 2010.  Gonzalez stated that he was an unemployed truck driver and knew his youngest daughter's godfather, Matos, was the owner of AMA Trucking in Las Vegas.  See United States' Debrief Report ¶ 4, at 1-2.  Gonzalez reported that he contacted Matos to ask for employment opportunity, and Matos hired Gonzalez to drive for AMA Trucking.  See id. ¶ 5, at 2.

Gonzalez stated that, in early February 2010, he flew from Florida to Las Vegas.  See id. He reported that, after arriving, he met his cousin Colinas-Gonzalez, and they drove to a truck yard where a tractor trailer was parked.  See id. ¶ 6, at 2.  According to Gonzalez, the trailer had already been loaded with wood and cement blocks.  See id.  Gonzalez reported that he was told that the current freight on the trailer was to be delivered in the Las Vegas area.  See id.  He stated that he never met with Matos before starting the road trip. See id. ¶ 7, at 2.

Gonzalez reported that he had previously met a Mexican male whom he knows only as Pedro.[2]  See id. ¶ 9, at 2.  He stated that he met Pedro at various TA truck stops.  See id.  Gonzalez reported that, shortly after receiving Matos' tractor trailer, Pedro contacted him, and they agreed to meet at a Home Depot parking lot in Las Vegas.  See id. ¶ 11, at 2-3.  Gonzalez states that he parked

---

[2] In his Supplemental Sentencing Memorandum, Gonzalez asserts that he  never referred to the man he was meeting as Pedro.  See Supplemental Sentencing Memorandum at 2.  Gonzalez contends that he always used the name Pablo.   See Supplemental Sentencing Memorandum at 2. Gonzalez argues that DEA agent Mark Hyland made a mistake when he used the name Pedro in the United States' Debrief Report. See Supplemental Sentencing Memorandum at 2.  Gonzalez asserts that this typographical error was discussed with Mr. Hyland.   See Declaration of Kevin R. Riva, filed August 26, 2010 (Doc. 37).  For the purpose of addressing the Supplemental Sentencing Memorandum, the Court accepts Gonzalez' assertion that the United States' use of the name Pedro in its debrief report was a typographical error.

the tractor trailer at the rear of the Home Depot parking lot and met Pedro by the side of the Home Depot building.  See id. ¶ 13, at 3.  Gonzalez reported that Pedro was "very smart and well dressed." Id. ¶ 13, at 3.  He stated that he never knew about Pedro's vehicle or residence, and did not know whether Pedro was a commercial truck driver.  See id. ¶ 14, at 3.  He reported that Pedro had either a wife or girlfriend, but he had never met her and he did not know if Pedro had children.  See id. He stated, however, that he and Pedro had a general conversation about family and small talk.  See id. ¶ 15, at 3.

Gonzalez reported that he knew he had to go to the AMA Trucking office to obtain a bill of lading for the wood and cement load, but instead he met with Pedro.  See id. ¶ 12, at 3.  According to Gonzalez, Pedro told him that he had blank bills of lading that Gonzalez could use for the trip. See id. ¶ 16, at 3.  Gonzalez reported that Pedro asked him if he could transport two boxes to Milwaukee for Pedro.  See id. ¶ 17, at 2.  He stated that he agreed and that he knew the current freight load on the tractor trailer would provide a cover for the illegal substances that he knew were inside the boxes.  See id. ¶¶ 17-18, at 3.

Gonzalez reported that Pedro told him that the two boxes, a mobile telephone, a bill of lading, and some money would be inside Gonzalez' tractor trailer when he returned to it.  See id. ¶ 19, at 3.  Gonzalez reported that, when he returned to the tractor trailer after about forty-five minutes, the two boxes, mobile telephone, about $2,000.00 in cash, and a handwritten bill of lading were inside the tractor.  See id. ¶ 26, at 4.

At the debrief, Hyland asked Gonzalez why he was driving eastbound on Interstate 40 if he was traveling from Las Vegas to Milwaukee.  See id. ¶ 21, at 4.  Gonzalez stated that Pedro recommended taking Interstate 40 to Tucumcari, New Mexico, and then to take United States Highway 54 to Wichita, Kansas, because there would be fewer checkpoints using that route.  See

id. ¶ 22, at 4.   Rodriguez asked Gonzalez how many times he had met Pedro, and Gonzalez responded that they had met four times, and had between ten and fifteen telephone conversations. See id. ¶ 24, at 4.  Mr. Nicholas Ganjei, Assistant United States Attorney, asked Gonzalez why he did not check in at AMA Trucking, and why he was not concerned about delivering the wood and cement load to the Las Vegas destination where he said they were to go.   See id. ¶ 25, at 4. Gonzalez could not explain why that was of no concern to him and could not explain why AMA Trucking would not be concerned about an unaccounted for tractor trailer which supposedly was out on a local delivery.  See id.

## PROCEDURAL BACKGROUND

On February 23, 2010, the Grand Jury issued an Indictment charging Gonzalez with one count of possession with intent to distribute five kilograms and more of a mixture and substance containing a detectable amount of cocaine, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(A). See Indictment, filed February 23, 2010 (Doc. 13).  Gonzalez and the United States entered into a plea agreement on April 19, 2010.  See Plea Agreement, filed April 19, 2010 (Doc. 27).  The plea agreement indicates that Gonzalez may be eligible for the safety-valve provisions set forth in 18 U.S.C. § 3553(f) and U.S.S.G. § 5C1.2.  See Plea Agreement ¶ 5, at 2.  The plea agreement states: "This reduction depends on, among other requirements of § 3553(f), the Defendant truthfully providing to the Government, before sentencing, all information and evidence concerning the offenses that were part of the same course of conduct underlying this agreement."  Plea Agreement ¶ 5, at 3.  Gonzalez debriefed with the United States on July 21, 2010.

Gonzalez filed a Sentencing Memorandum on July 27, 2010.   In his sentencing memorandum, Gonzalez argued that he qualified for the safety-valve provisions.  See Sentencing Memorandum at 2.  He contended that the PSR accurately set forth the plea agreement and the facts

of the case.  See Sentencing Memorandum at 2.  Gonzalez urged the Court to make the finding that

he had satisfied the criteria for the safety-valve provision and apply the 2-level reduction to his

offense level.  See Sentencing Memorandum at 2.  The United States, however, argued that

Gonzalez' debrief was unsatisfactory because he gave a purposefully misleading account of what

had transpired.  See United States' Response to Defendant's Sentencing Memorandum at 2, filed

July 27, 2010 (Doc. 31).

        The Court held a hearing on July 29, 2010.  Mr. Kevin R. Riva, counsel for Gonzalez, argued

that no facts existed which showed Gonzalez was untruthful -- instead the facts supported his

assertion that the information he gave the United States was truthful  -- and that Gonzalez had no

reason to lie.  See Transcript of Hearing at 9:12-16 (taken July 29, 2010)(Riva)("Tr.").[3]  Assistant

United States Attorney John Anderson argued that it was important to look at the big picture to see

that a reasonable individual would not entrust someone he or she does not know with approximately

$1.5 million dollars worth of cocaine.  See id. at 10:17-25 (Anderson).  He argued that Gonzalez'

story did not acknowledge the reality that the facts demonstrate a high level of trust and a high

degree of coordination.  See id. at 10:25-11:10 (Anderson).  Mr. Riva contended that the United

States was theorizing and that the theorizing was not sufficient to substantiate a finding that

Gonzalez  was not being truthful.  See id. at 12:7-14 (Riva).

        The Court issued a Memorandum Opinion and Order on August 18, 2010.  See

Memorandum Opinion and Order, filed August 18, 2010 (Doc. 34)("August 18, 2010 Memorandum

Opinion and Order).  The Court found that Gonzalez failed to prove by a preponderance of the

evidence that he made a complete and truthful disclosure to the United States of all the information

---

        [3] The Court's citations to the transcript refer to the court reporter's original, unedited version.
Any final transcript may contain slightly different page and/or line numbers.

he had concerning his offense.  See id. at 1.  The Court agreed with the United States that the
quantity of narcotics and the high value of the narcotics -- approximately $1.5 million dollars -- did
not suggest the arms-length transaction that Gonzalez' debrief portrayed. See id. at 19. The Court
stated that it was unlikely that Gonzalez knew nothing but the first name of the man who gave him
a large quantity of drugs to transport. See id. at 19-20.  Although the Court mentioned the apparent
inconsistency resulting from the Pedro/Pablo distinction, the Court was more concerned that
Gonzalez was unable or unwilling to give more than a "vague and unhelpful description" of Pablo,
and unable or unwilling to indicate whether Pablo had a car or give his telephone number.  See id. at
20.

        The Court relied on other informational gaps in Gonzalez' debrief to support its holding.
See id. at 20-22.  There were inconsistencies between his initial interview with the DEA and his later
debrief regarding where he picked up the tractor trailer, and whether he met with Matos before
starting the road trip. See id. at 20.  The Court stated that it was unclear why the tractor trailer would
have cargo, but no bill of lading or destination.  See id. at 21.  The Court shared the United States'
concern why Gonzalez was not troubled with the fact that he would be taking an AMA Trucking
vehicle across the country, when he was only tasked with a local cross-town delivery.  See id.  The
presence of these inconsistent or unexplained facts led the Court to believe that Gonzalez was not
being completely forthcoming with the United States.  See id.  The Court also found that it was
improbable that Gonzalez could not provide more details in parts of his story.  See id. It appeared
to be more probable than not that Gonzalez would be able to describe at which truck stops he
previously met Pablo.  See id.  The Court concluded that there were too many gaps and illogical
connections in Gonzalez' proffer for the Court to be persuaded, by a preponderance of the evidence,
that he had given the United States all of the information that he had. See id. at 22. The Court thus

held that Gonzalez was ineligible for safety-valve relief. See id.

Gonzalez filed a Supplemental Sentencing Memorandum on August 26, 2010. See Doc. 38. Gonzalez contends that there were factual inaccuracies and significant omissions in the debrief report upon which the Court relied in issuing its Memorandum Opinion and Order.   See Supplemental Sentencing Memorandum at 2. Gonzalez argues that he never referred to the man he met as Pedro. See Supplemental Sentencing Memorandum at 2. He states that he always used the name Pablo, and that Hyland made a mistake in the debrief report when he referred to the individual as Pedro. See Supplemental Sentencing Memorandum at 2. Gonzalez contends that he gave a detailed description of Pablo during the debrief, and that the majority of this information was omitted from the debrief report.  See Supplemental Sentencing Memorandum at 2.  Gonzalez states that his description of Pablo included the following details:  (I) Mexican; (ii) five feet, seven inches tall; (iii) thirty-two to thirty-four years of age; (iv) speaks Spanish; (v) clean all the time; (vi) no tatoos; (vii) well-kept; (viii) lives in California; and (ix) married.  See Supplemental Sentencing Memorandum at 2.  Gonzalez contends that he was not questioned regarding which TA truck stops he encountered Pablo, or whether he had any information relating to truck stops and possible criminal activity.  See Supplemental Sentencing Memorandum at 2.   Gonzalez asks the Court to reconsider its Memorandum Opinion and Order based upon the additional information provided in the Supplemental Sentencing Memorandum.  See Supplemental Sentencing Memorandum at 3. Gonzalez filed two declarations that support the information asserted in the Supplemental Sentencing Memorandum. See Declaration of Angela Arellanes, filed August 26, 2010 (Doc. 36); Declaration of Kevin R. Riva, filed August 26, 2010 (Doc. 37).

The Court held a hearing on August 31, 2010.  Mr. Riva argued that Hyland made a typographical error when he used the name Pedro in the debrief report.  See Transcript of Hearing

at 3:25-4:6 (taken August 31, 2010)(Riva)("August 31, 2010 Tr."). Mr. Riva also argued that Gonzalez thoroughly described Pablo, but a number of the descriptive details were omitted from the debrief report. See id. at 4:6-10 (Riva). Mr. Riva contended that Hyland did not ask Gonzalez any questions about his contact with Pablo at TA truck stops. See id. at 4:24-5:5 (Riva). Mr. Ganjei argued that, even if the United States conceded that the Pedro/Pablo distinction was a typographical error, the error would not affect the overall weight of the factual findings that the Court made. See id. at 5:18-6:12 (Ganjei). Mr. Ganjei disagreed with Gonzalez' characterization that Hyland was not interested in investigating. See id. at 6:15-16 (Ganjei). During the interview, Hyland asked Gonzalez whether he could give the United States anything that would enable it to investigate or establish that Pablo exists. See id. at 6:9-12 (Ganjei). Mr. Ganjei contends that Gonzalez answered that he could not. See id. at 12-13 (Ganjei). Mr. Ganjei argued that Hyland became firmly convinced that Gonzalez was not a reliable informant and decided that he could not learn anything from Gonzalez. See id. at 6:13-19 (Ganjei). Mr. Ganjei stated that, after the interview was terminated, Ms. Arellanes, local counsel for Gonzalez, came out of the interview room and offered Gonzalez' statement that he met Pablo at a TA truck stop as a response to Hyland's request for information that would enable the government to establish that Pablo exists. See id. at 11:12-15 (Ganjei).

## LAW REGARDING SAFETY VALVE

Section 3553(f) of Title 18 of the United States Code, commonly known as the safety-valve provision, allows courts to impose a sentence below a statutory minimum in certain circumstances. Section 3553(f) states that, in the case of an offence under 21 U.S.C. §§ 841, 844, 846, 960, or 963, the court shall impose a sentence in accordance with the applicable guidelines without regard to any statutory minimum sentence, if the court finds at sentencing, after the United States has been

afforded the opportunity to make a recommendation, that:

> (1) The defendant does not have more than 1 criminal history point, as determined under the sentencing guidelines;

> (2) The defendant did not use violence or credible threats of violence or possess a firearm or other dangerous weapon (or induce another participant to do so) in connection with the offense;

> (3) The offense did not result in death or serious bodily injury to any person;

> (4) The defendant was not an organizer, leader, manager, or supervisor of others in the offense, as determined under the sentencing guidelines and was not engaged in a continuing criminal enterprise, as defined in 21 U.S.C. § 848; and

> (5) Not later than the time of the sentencing hearing, the defendant has truthfully provided to the Government all information and evidence the defendant has concerning the offense or offenses that were part of the same course of conduct or of a common scheme or plan, but the fact that the defendant has no relevant or other useful information to provide or that the Government is already aware of the information shall not preclude a determination by the court that the defendant has complied with this requirement.

18 U.S.C. § 3553(f). United States v. Myers, 106 F.3d 936, 941 (10th Cir. 1997)(stating that, if the defendant meets the five criteria, "the district court shall impose a sentence pursuant to the sentencing guidelines, without regard to the statutory minimum")(citation omitted).

The burden is on the defendant to prove that he or she meets all the criteria for the safety-valve provision. See United States v. Virgen-Chavarin, 350 F.3d 1122, 1129 (10th Cir. 2003). A defendant can meet this burden by showing, "by a preponderance of the evidence, that he qualifies for relief from a minimum mandatory sentence." United States v. Patron Montano, 223 F.3d 1184, 1189 (10th Cir. 2000). See United States v. Gonzalez-Montoya, 161 F.3d 643, 652 (10th Cir. 1998)("The burden of proving all five requirements by a preponderance of the evidence lies with the defendant."). To satisfy this criteria, the defendant must affirmatively volunteer all he or she knows, including facts beyond the basic elements of the crime. See United

States v. Myers, 106 F.3d at 941.  "The government does not bear the burden of seeking out, or specifically requesting, information from the defendant."  United States v. Perez-Marin, 124 F. App'x 612, 613 (10th Cir. 2005)(citing United States v. Ramirez, 94 F.3d 1095, 1101 (7th Cir. 1996)).

The fifth requirement for safety-valve eligibility is very broad, requiring disclosure of everything that the defendant knows about his or her actions, and about the actions of those who participated in the crime with the defendant.  See United States v. Acosta-Olivas, 71 F.3d 375, 378-79 (10th Cir. 1995).  Disclosure is required "whether or not it is relevant or useful to the government's investigation."  United States v. Myers, 106 F.3d 936, 940 (10th Cir. 1997)(quoting United States v. Shrestha, 86 F.3d 935 (9th Cir. 1996)).  A defendant's disclosure "must not merely be truthful but also complete."  United States v. Stephenson, 452 F.3d 1173, 1180 (10th Cir. 2006). See also  United States v. Altamirano-Quintero, 511 F.3d 1087, 1098 (10th Cir. 2007)(finding that there were "obvious informational gaps in the facts [the defendant] admitted when he pled guilty," when the defendant did not identify any other participants in the charged conspiracy or explain why he could not do so); United States v. Montoya, 227 F. App'x 740, 743-44 (10th Cir. 2007)(affirming the district court's finding that the defendant failed to show by a preponderance of the evidence that he made a complete and truthful disclosure when his story changed throughout the course of three interviews and when the district court assumed that someone distributing 324 grams of methamphetamine would know more about his supplier than the defendant claimed). The specific question § 3553(f)(5) poses -- whether the defendant has provided the United States with truthful and complete information -- is a factual determination.  See United States v. Altamirano-Quintero, 511 F.3d at 1098; United States v. Stephenson, 452 F.3d at 1180 (stating that the Tenth Circuit is "cognizant that the district court's application of the safety valve is fact specific and dependent on

credibility determinations that cannot be replicated with the same accuracy on appeal").

## ANALYSIS

Gonzales argues that the Court should reconsider its August 18, 2010 Memorandum Opinion and Order based upon the additional information provided in the Supplemental Sentencing Memorandum. The Court has carefully considered the additional facts before it -- in the Supplemental Sentencing Memorandum, in the Declarations and in the hearing -- and finds that its prior Memorandum Opinion and Order was correct in holding that Gonzalez has failed to prove by a preponderance of the evidence that he has made a complete and truthful disclosure to the United States of all the information he has concerning his offense.

To satisfy the safety-valve requirements, Gonzalez must affirmatively volunteer all he knows, including facts beyond the basic elements of the crime. See United States v. Myers, 106 F.3d at 941; United States v. Perez-Marin, 124 F. App'x. at 613 ("The government does not bear the burden of seeking out, or specifically requesting, information from the defendant."). The Court believes that Gonzalez has not been complete in the information he has concerning his offense and the people involved in the events that transpired. See United States v. Stephenson, 452 F.3d at 1180 (stating that a defendant's disclosure "must not merely be truthful but also complete"). Gonzalez contends that the references to a man named Pedro in the debrief report are the result of a typographical error and that Gonzalez always used the name Pablo. See Supplemental Sentencing Memorandum at 2. At the hearing on August 31, 2010, Mr. Ganjei did not concede that the Pedro/Pablo distinction was a typographical error, and contended that, even if the United States were to concede that the Pedro/Pablo distinction was a typographical error, the United States did not see how it would affect the overall weight of the factual findings that the Court made. See Tr. at 5:18-22 (Ganjei). For the purpose of addressing the Supplemental Sentencing Memorandum, the Court

accepts Gonzalez' assertion that the United States' use of the name Pedro in its debrief report was a typographical error.

The Court agrees with the United States, that even if the Pedro/Pablo distinction is a typographical error, it would not affect the Court's conclusion in its Memorandum Opinion and Order. Although the Pedro/Pablo distinction was one of the examples to which the Court pointed as showing a lack of consistency in Gonzalez' story, the distinction was not an overly significant fact in the Court's analysis. The Court was more concerned with the other gaps and illogical connections in Gonzalez' proffer, such as Gonzalez' inability or unwillingness to give a description of Pablo that was not "vague and unhelpful."  August 18, 2010 Memorandum Opinion and Order at 20. The resolution of the Pedro/Pablo distinction thus does not impact the Court's prior conclusion that Gonzalez has not made a complete and truthful disclosure to the United States of all the information he has regarding his offense.

Gonzalez contends that he has provided all the facts he knows regarding Pablo.  <u>See</u> Supplemental Sentencing Memorandum at 2.  He asserts that he gave a detailed description of Pablo during the debrief interview, which was omitted from the debrief report.  <u>See</u> Supplemental Sentencing Memorandum at 2.  Gonzalez describes Pablo as a Mexican male who speaks Spanish and lives in California, is thirty-two to thirty-five years of age, is five feet seven inches in height, is clean all the time, is well-kept, and is  married. <u>See</u> Supplemental Sentencing Memorandum at 2. At the hearing on August 31, 2010, Mr. Ganjei argued that Gonzalez never provided any information through which the United States could establish that Pablo existed. <u>See</u> Tr. at 6:7-13 (Ganjei).

The Court previously considered Gonzalez' description of Pablo as reported in the United States' Debrief Report.  The description in the Supplemental Sentencing Memorandum includes

-14-

several descriptive characteristics that the Court previously considered in reviewing the debrief report and several additional descriptive characteristics. The Court was previously aware that Gonzalez had described Pablo as a Mexican male, who was married or had a girlfriend, and was smart and well-dressed. See United States' Debrief Report ¶¶ 9, 13, 14, at 2, 3. The description that Gonzalez provided in his Supplemental Sentencing Memorandum is not markedly different. The depiction of Pablo as well-kept and clean is similar to the depiction of Pablo as well-dressed in the United States' Debrief Report. The additional information that Gonzalez has provided the Court regarding Pablo's estimated age and height, his ability to speak Spanish, his residence in California, and that he does not have tatoos, is not very descriptive. The Court believes that Gonzalez, more likely than not, could have provided a more specific description of Pablo. See United States v. Montoya, 227 F. App'x 740, 744 (10th Cir. 2007)(stating that "the district court's assumption that someone distributing 324 grams of methamphetamine would know more about his supplier than [the defendant] claimed he knew was a reasonable one").

Gonzalez had ample opportunity to observe Pablo's appearance. Gonzalez alleges that he saw Pablo four times, engaged in conversation with Pablo, and spent forty-five minutes with Pablo behind the Home Depot in Las Vegas. See Presentence Investigation Report ("PSR") ¶¶ 13, 14, 18 (disclosed June 16, 2010); United States Debrief Report ¶ 26, at 4. Although Gonzalez has provided a few additional descriptive characteristics of Pablo in the Supplemental Sentencing Memorandum, his depiction of Pablo remains vague and unhelpful. The Court remains concerned that Gonzalez cannot describe Pablo with any more detail or offer an explanation for why he is unable to better describe Pablo. See United States v. Altamirano-Quintero, 511 F.3d 1087, 1098 (10th Cir. 2007)(finding that there were "obvious informational gaps" when the defendant neither identified any of the other participants in the charged drug conspiracy nor explained why he could not do so).

-15-

Gonzalez argues that he did not provide more details regarding the different TA stops because Hyland did not question him about the different TA stops at the debrief, and did not indicate any interest in information that he may have had about possible TA stops or stops frequented by truck drivers that may have increased drug activity.  <u>See</u> Supplemental Sentencing Memorandum at 2-3.  At the hearing on August 31, 2010, Mr. Ganjei argued that the information about TA stops was offered after the interview was over in response to a request for information that would identify Pablo.  <u>See</u> <u>id.</u> at 6:9-13, 11:12-19 (Ganjei).

Gonzalez' argument does not help him.  Gonzalez has a duty to volunteer and tell all  that he knows, without questioning.  <u>See</u> <u>United States v. Gonzalez-Montoya</u>, 161 F.3d 643, 652 (10th Cir. 1998)("Under § 3553(f)(5), a defendant must affirmatively volunteer all he knows, including facts beyond the basic elements of the crime."); <u>United States v. Costa-Olives</u>, 71 F.3d at 379 (stating that § 3553(f)(5) "requires that a defendant truthfully tell all he knows to the government, regardless of whether this information is useful to the government").  The safety-valve is not a game of twenty-one questions, or seek and ye shall find. Gonzalez must be forthcoming with all information, regardless of whether the United States asks the right questions or he thinks that the United States is not interested in what he is saying.  This reason for lack of disclosure -- rather than helping Gonzalez -- confirms the Court's concern that Gonzalez has not been forthcoming, but sees debriefing as a game.

Moreover, even if Hyland had given Gonzalez the opportunity to provide more information regarding the TA truck stops, the additional information regarding the truck stops would not have resolved the other inconsistencies and informational gaps in Gonzalez' story.  The Court stated, in its August 18, 2010 Memorandum Opinion and Order, that there are parts of Gonzalez' story where it seems improbable that Gonzalez could not provided more details.  <u>See</u> August 18, 2010

Memorandum Opinion and Order at 21.  As an example, the Court stated that it seems more probable than not that Gonzalez would be able to describe at which TA truck stops he previously met with Pablo. See id.  Even excluding the lack of detail in Gonzalez' story regarding the TA truck stops, there are other parts of his story where it seems improbable that Gonzalez could not provide more details.   For example, it seems more probable than not that Gonzalez would be able to describe Pablo in a more specific matter after meeting with Pablo on several occasions, conversing with Pablo, and spending forty-five minutes with Pablo behind the Home Depot.  The Court finds that the circumstances suggest a degree of familiarity between Gonzalez and Pablo.  It is unlikely that Gonzalez can provide nothing but a first name and vague description of a man who entrusted him with such a large quantity of drugs to transport.  It seems more probable than not that Gonzalez would be able to provide certain details, such as a more specific description of Pablo or what kind of car Pablo drove.  The Court thus remains convinced that  Gonzalez has not disclosed everything that he knows about his own actions and about the actions of those who participated in the crime with him. See United States v. Costa-Olives, 71 F.3d 375, 378 (10th Cir. 1995)(stating that the fifth requirement for safety-valve eligibility requires disclosure of everything the defendant knows about his or her own actions, and about the actions of those who participated in the crime with the defendant).

Furthermore, the Court continues to think that there are logical inconsistencies in Gonzalez' proffer that show informational gaps. For example, the Court still shares the United States' concern about why Gonzalez was not troubled with the fact that he would be taking an AMA Trucking vehicle across the country when he was supposedly tasked with a local cross-town delivery. The continued presence of such inconsistent or unexplained facts convinces the Court that Gonzalez is not being completely forthcoming with the United States.

-17-

After considering the additional information that Gonzalez provided in his Supplemental Sentencing Memorandum, the Court has concluded that there are still informational gaps and inconsistencies in Gonzalez' proffer. The Court thus finds that its previous Memorandum Opinion and Order (Doc. 34) reached the correct conclusion.

**IT IS ORDERED** that Defendant Carlos Gonzalez' request in his Supplemental Sentencing Memorandum that the Court reconsider its Memorandum Opinion and Order, filed August 18, 2010 (Doc. 34) is granted in part and denied as to part. The Court has granted Gonzalez' request to reconsider its prior Memorandum Opinion and Order. All of Gonzalez' additional requests, specifically to sustain his objection to ¶ 64 of the Presentence Report, are denied.

_____
UNITED STATES DISTRICT JUDGE

*Counsel*:

Kenneth J. Gonzales
    United States Attorney
John C. Anderson
Nicholas Ganjei
    Assistant United States Attorneys
Albuquerque, New Mexico

      *Attorneys for the Plaintiff*

Kevin R. Riva
Los Angeles, California

-- and --

Angela Arellanes
Albuquerque, New Mexico

      *Attorneys for the Defendant*